# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| BETSY MONZELLA, | Case No.: 1:16-cv-00497-REB |
| Petitioner, | **MEMORANDUM DECISION AND ORDER** |
| vs. | |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security | |
| Respondent. | |

Pending before this Court is Petitioner Betsy Monzella's Petition for Review (Docket No. 2), seeking review of the Social Security Administration's final decision to deny her claim for Social Security Disability Insurance Benefits. *See generally* Pet. for Review (Docket No. 2). This action is brought pursuant to 42 U.S.C. § 405(g). Having carefully considered the record and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. ADMINISTRATIVE PROCEEDINGS

On July 15, 2013, Betsy Monzella ("Petitioner") filed an application for Disability Insurance Benefits, alleging disability beginning October 1, 2012. This claim was initially denied on September 18, 2013 and, again, on reconsideration on October 24, 2013. On October 30, 2013, Petitioner timely filed a Request for Hearing before an Administrative Law Judge ("ALJ"). On December 10, 2014, ALJ Lloyd E. Hartford held a hearing in Boise, Idaho, at which time Petitioner, represented by attorney Joseph F. Brown, appeared and testified.

Impartial vocational expert, Cassie Mills, also appeared and testified at the same December 10, 2014 hearing.

On February 26, 2015, the ALJ issued a Decision denying Petitioner's claim, finding that she was not disabled within the meaning of the Social Security Act. Petitioner timely requested review from the Appeals Council (while also submitting additional medical records) on April 28, 2015 and, on July 18, 2016, the Appeals Council denied Petitioner's Request for Review, making the ALJ's decision the final decision of the Commissioner of Social Security.

Having exhausted her administrative remedies, Petitioner timely filed the instant action, arguing that "[t]he decision of the Commissioner is without foundation, not supported by substantial evidence, and is, in fact, contrary to the evidence presented," while also claiming that "[t]he Commissioner erred in his failure to apply the appropriate standard of law." Pet. for Review, p. 3 (Docket No. 2). In particular, Petitioner identifies the "issues of this case" as "(1) whether the ALJ gave specific and legitimate reasons in support of his weighing of the medical opinion evidence; (2) whether the ALJ gave specific, clear, and convincing reasons in support of his finding that Petitioner's allegations were not fully credible; and (3) whether the evidence submitted to the Appeals Council undermines the evidentiary basis for the ALJ's findings." Pet.'s Brief, p. 1 (Docket No. 15). Petitioner therefore requests that the Court either reverse the ALJ's decision and find that she is entitled to disability benefits, or, alternatively, remand the case for further proceedings and award attorneys' fees. *See* Pet. for Review, p. 3 (Docket No. 2).

## II.  <u>STANDARD OF REVIEW</u>

To be upheld, the Commissioner's decision must be supported by substantial evidence and based on proper legal standards. *See* 42 U.S.C. § 405(g); *Matney ex. rel. Matney v. Sullivan*,

981 F.2d 1016, 1019 (9th Cir. 1992); *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990). Findings as to any question of fact, if supported by substantial evidence, are conclusive. *See* 42 U.S.C. § 405(g). In other words, if there is substantial evidence to support the ALJ's factual decisions, they must be upheld, even when there is conflicting evidence. *See Hall v. Sec'y of Health, Educ. & Welfare*, 602 F.2d 1372, 1374 (9th Cir. 1979).

"Substantial evidence" is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). The standard requires more than a scintilla but less than a preponderance (*see Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

With respect to questions of fact, the role of the Court is to review the record as a whole to determine whether it contains evidence that would allow a reasonable mind to accept the conclusions of the ALJ. *See Richardson*, 402 U.S. at 401; *see also Matney*, 981 F.2d at 1019. The ALJ is responsible for determining credibility and resolving conflicts in medical testimony (*see Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)), resolving ambiguities (*see Vincent ex. rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984)), and drawing inferences logically flowing from the evidence (*see Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)). Where the evidence is susceptible to more than one rational interpretation, the reviewing court may not substitute its judgment or interpretation of the record for that of the ALJ. *See Flaten*, 44 F.3d at 1457; *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

**MEMORANDUM DECISION AND ORDER - 3**

With respect to questions of law, the ALJ's decision must be based on proper legal standards and will be reversed for legal error. *See Matney*, 981 F.2d at 1019. The ALJ's construction of the Social Security Act is entitled to deference if it has a reasonable basis in law. *See id.* However, reviewing federal courts "will not rubber-stamp an administrative decision that is inconsistent with the statutory mandate or that frustrates the congressional purpose underlying the statute." *See Smith v. Heckler*, 820 F.2d 1093, 1094 (9th Cir. 1987).

## III. DISCUSSION

### A. Sequential Process

In evaluating the evidence presented at an administrative hearing, the ALJ must follow a sequential process in determining whether a person is disabled in general (*see* 20 C.F.R. §§ 404.1520, 416.920) – or continues to be disabled (*see* 20 C.F.R. §§ 404.1594, 416.994) – within the meaning of the Social Security Act.

The first step requires the ALJ to determine whether the claimant is engaged in substantial gainful activity ("SGA"). *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). SGA is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities. *See* 20 C.F.R. §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized. *See* 20 C.F.R. §§ 404.1572(b), 416.972(b). If the claimant has engaged in SGA, disability benefits are denied, regardless of how severe her physical/mental impairments are and regardless of her age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not engaged in SGA, the analysis proceeds to the second step. Here, the ALJ found that Petitioner "did not engage in substantial gainful activity

during the period from her alleged onset date of October 1, 2012 through her date last insured of September 30, 2014." (AR 27).

The second step requires the ALJ to determine whether the claimant has a medically determinable impairment, or combination of impairments, that is severe and meets the duration requirement. *See* 20 C.F.R. § 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment or combination of impairments is "severe" within the meaning of the Social Security Act if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. *See* 20 C.F.R. §§ 404.1521, 416.921. If the claimant does not have a severe medically determinable impairment or combination of impairments, disability benefits are denied. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). Here, the ALJ found that Petitioner had the following severe impairments: "degenerative disc disease of the spine, arthralgia of the knees, and obesity." (AR 28-29).

The third step requires the ALJ to determine the medical severity of any impairments; that is, whether the claimant's impairments meet or equal a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the answer is yes, the claimant is considered disabled under the Social Security Act and benefits are awarded. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant's impairments neither meet nor equal one of the listed impairments, the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. *See id*. Here, the ALJ concluded that Petitioner's above-

listed impairments, while severe, do not meet or medically equal, either singly or in combination, the criteria established for any of the qualifying impairments. *See* (AR 29-30).

The fourth step of the evaluation process requires the ALJ to determine whether the claimant's residual functional capacity ("RFC") is sufficient for the claimant to perform past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). An individual's RFC is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. *See* 20 C.F.R. §§ 404.1545, 416.945. Likewise, an individual's past relevant work is work performed within the last 15 years or 15 years prior to the date that disability must be established; also, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity. *See* 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), 416.965. Here, the ALJ determined that Petitioner has the RFC "to perform light work as defined in 20 C.F.R. § 404.1567(b)," including:

> standing and/or walking for a total of about six hours in an eight-hour workday, and sitting for a total of six hours in an eight-hour workday. She can frequently climb ramps and stairs, crouch, kneel, and crawl. She can never climb ladders, ropes, and scaffolds. Due to obesity and knee pain, the claimant should avoid all exposure to hazards, e.g., machinery and heights, and concentrated exposure to vibrations.

(AR 30-34).

In the fifth and final step, if it has been established that a claimant can no longer perform past relevant work because of her impairments, the burden shifts to the Commissioner to show that the claimant retains the ability to do alternate work and to demonstrate that such alternate work exists in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1520(f), 416.920(f); *see also Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993). If the claimant is able to do other work, she is not disabled; if the claimant is not able

to do other work and meets the duration requirement, she is disabled. Here, the ALJ found that, through the date last insured, Petitioner was capable of performing past relevant work as a customer service representative/teller. *See* (AR 34). The ALJ then went on to find that there are also other jobs that exist in significant numbers in the national economy that Petitioner can perform, including ticket taker (light), cashier (light), parking lot attendant (light), ticket taker/counter attendant (sedentary), document preparer (sedentary), and charge account clerk (sedentary). *See* (AR 35-36). Therefore, based on Petitioner's age, education, work experience, and RFC, the ALJ concluded that Petitioner "was not under a disability, as defined in the Social Security Act, at any time from October 1, 2012, the alleged onset date, through September 30, 2014, the date last insured." (AR 36).

**B.      Analysis**

    1.      <u>The ALJ Properly Considered Petitioner's Treating Physicians' Opinions</u>

The medical opinion of a treating physician is entitled to special consideration and weight. *See Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir. 1989). Such deference is warranted because the treating physician "is employed to cure and has a greater opportunity to know and observe the individual." *Id*. However, a treating physician's opinion is not necessarily conclusive. *See id*. at 762. If the treating physician's opinions are not contradicted by another doctor, they may be rejected only for clear and convincing reasons. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Even if the treating physician's opinions are contradicted by another doctor, they can only be rejected if the ALJ provides specific and legitimate reasons supported by substantial evidence in the record. *See id*. A lack of objective medical findings, treatment notes, and rationale to support a treating physician's opinions is a sufficient reason for

rejecting that opinion.  *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001); *see also*

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601-02 (9th Cir. 1999) (ALJ may discount

physicians' opinions based on internal inconsistencies, inconsistencies between their opinions

and other evidence in record, or other factors ALJ deems material to resolving ambiguities);

*Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012) ("The ALJ need not accept the opinion of

any physician, including a treating physician, if that opinion is brief, conclusory, and

inadequately supported by clinical findings.").

　　　　Here, the ALJ found that consultative examiner James Bates, M.D.'s opinions merited

"great weight," whereas treating physician Richard Manos, M.D.'s opinions merited only "little

weight."  (AR 34).  Petitioner claims that the ALJ's elevation of Dr. Bates's opinions (and,

likewise, those non-examining source opinions relying upon Dr. Bates's opinions) over those

from Dr. Manos was not based on specific and legitimate reasons supported by substantial

evidence in the record, given that "Dr. Manos's assessment was based on a review of objective

evidence as well as his interview and examination, where[as] Dr. Bates had minimal information

on which to base his assessment."  *Id*. at p. 8.  Stated differently, according to Petitioner, at the

very least, the reasons for rejecting Dr. Manos's more complete opinion should apply equally to

Dr. Bates's more deficient opinion.  *See id*. at p. 11 ("If there is a question as to how the

limitations were arrived at, it applies to both assessments, not just to the one more favorable to

Petitioner.  The ALJ's finding in this regard was neither a reasonable interpretation of the

evidence, nor a legitimate reason for giving greater weight to the opinions of Dr. Bates and the

non-examining sources.").  As such, Petitioner submits that the ALJ improperly analyzed the

medical evidence in assessing the opinions of Drs. Manos and Bates.  The Court disagrees.

**MEMORANDUM DECISION AND ORDER - 8**

Within his September 2, 2014 "Physician's Assessment of Physical Activities," Dr. Manos noted that Petitioner required longer or more frequent daily rest breaks; that Petitioner's "conditions" required two or more sick days from work per month; that Petitioner could "frequently or occasionally" lift and carry 20 pounds without injury or pain; and that Petitioner could sit for four hours, stand for two to four hours, and walk two hours in an 8-hour workday (each for 30 minutes at a time). *See* (AR 315). Except, as noted by the ALJ, there is no underlying basis for these referenced physical limitations – especially when considering that Dr. Manos only saw Petitioner twice, and never during either visit did he perform any testing that substantiated these opinions. *See* (AR 34) (ALJ reasoning: "[T]he claimant reported seeing Dr. Manos only twice. The claimant did not recall speaking with Dr. Manos regarding her ability to stand and/or sit, nor did Dr. Manos send her for any testing that might be used as a basis for these opinions.") (citing hearing testimony (AR 42-111)). An ALJ may "permissibly reject . . . check-off reports that [do] not contain any explanation of the bases of their conclusions." *See, e.g.*, *Molina*, 674 F.3d at 1111 (9th Cir. 2012); *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996); *see also Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (observing that the regulations "give more weight to opinions that are explained than to those that are not."); *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (ALJ may reject physician's opinion if it is based "to a large extent" on a claimant's self-reports that have been properly discounted as not credible [(*see infra*)]."); *Ellison v. Colvin*, 2014 WL 4853126, *6 (D. Idaho 2014) ("When a physician relies on Petitioner's subjective complaints, which the ALJ properly discounted in an adverse credibility determination, that is a legally sufficient reason on which the ALJ could properly rely to accord less weight to [physician's] opinion.").

It is true that there are notations within Dr. Manos's limited treatment notes that Petitioner is grappling with back and leg pain. *See* (AR 316-19). But, importantly, whether Petitioner suffers from these impairments is not at issue here. To be clear, the ALJ found in no uncertain terms that Petitioner's degenerative disc disease of the spine and arthralgia of the knees was "severe," and that Petitioner's residual functional capacity is negatively impacted. *See supra* (citing AR 28-29). And, for the most part, these treatment notes reflect Petitioner's periodic subjective complaints of pain. However, largely absent from such notes are any corresponding opinions or findings from Dr. Manos (1) paralleling the opinions reached (in the "Physician's Assessment of Physical Activities") as to Petitioner's alleged functional limitations, or (2) quantifying in any consistent degree Petitioner's pain statements and resultant limitations. *See, e.g.*, (AR 319) (Dr. Manos's July 23, 2014 treatment note: "Neurologic, motor, iliopsoas, quadriceps, hamstrings, tibialis anterior, extensor halluci longus, gastroc soleus and peroneals were tested. They were 5/5 except for the left tibialis anterior and EHL which I would rate as 4/5."). These realities support the ALJ's decision to question Dr. Manos's opinions. *See Carter v. Colvin*, 651 Fed. Appx. 721, 722 (9th Cir. 2016) ("The ALJ provided 'specific [and] legitimate reasons' for giving little weight to some of the treating doctors' opinions. In particular, it was proper for the ALJ to give little weight to a portion of Dr. Sandra Ritland's opinion that was uncertain and speculative, as well as a portion of Dr. David Little's opinion that did not rest on mental status testing.") (citing *Chaudhry*, 688 F.3d at 671)).

The ALJ also noted that Dr. Manos's opinions do not exist in isolation but, rather, are inconsistent with other medical opinions in the record. *See* (AR 31-34). For example:

**MEMORANDUM DECISION AND ORDER - 10**

- In November 2014,[1] treating physician, Jennifer Holliday, M.D., diagnosed Petitioner with degenerative joint disease, but nonetheless found that she exhibited full 5/5 strength in her bilateral lower extremities with no edema. (AR 31) (citing (AR 303, 309)).

- In September 2013, Dr. Bates made the following observations: "Stands in an upright position. Gait is within normal limits. [Petitioner] can toe walk, heel walk and tandem walk. Overall movement patterns are stable but slow. [Petitioner] reports using a cane on occasion with flare ups [but] [d]id not require one today for the examination. Can raise up from a squat. Transitions up and down from the chair and on and off the examination table within normal limits. No significant difficulties noted." Additionally, Dr. Bates noted that Petitioner had "mild restrictions" of the cervical spine and full range of motion in her lumbosacral spine; that Petitioner's major joints of the upper extremities are within normal limits, as are the major joints of the lower extremities (but knee flexion is limited by "body habitus" (physique)). Dr. Bates found that Petitioner's limitations "would restrict activities sitting, standing, and walking," but recommended "general changes of position every 10-20 minutes" and "[w]ork, lifting, [and] carrying at a light level." (AR 32, 34) (citing (AR 288-90)).[2]

- Medical consultant, Ward Dickey, M.D., opined that Petitioner could occasionally lift and/or carry 20 pounds; could frequently lift and/or carry 10 pounds; could stand and/or walk about six hours in an 8-hour workday; could sit about 6 hours in an 8-hour workday; had unlimited push/pull restrictions; could frequently climb ramps/stairs, but never climb ladders, ropes, or scaffolds; had unlimited balancing and stooping restrictions; and could

---

[1] The ALJ noted this treatment note as November 2014. (AR 31). Though confusing, in actuality, it appears that Dr. Holliday's notes are more appropriately from the late 2013/early 2014 time period. *See, e.g.*, Pet.'s Brief, p. 16 (Docket No. 15) (noting that "November 2014 was when the note was printed out"). Even so, such treatment notes still apply to exhibit an inconsistency of medical opinions.

[2] The Court agrees with the ALJ that, as compared to Dr. Manos's opinions, Dr. Bates's opinions tracked his examination of Petitioner and were supported by findings made during that same examination. *See* (AR 34) ("Further, Dr. Manos's opinion conflict with the findings of Dr. Bates, who examined the claimant and provided supporting rationale for his opinion."); *see also* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medial opinion, the more weight we will give that medical opinion."). In this respect, it cannot be said that bases for these two opinions are the same and, therefore, must be treated the same.

MEMORANDUM DECISION AND ORDER - 11

frequently kneel, crouch, and crawl. (AR 33) (citing (AR 119)). Accordingly, Dr. Dickey concluded that Petitioner could perform certain past relevant work as a "member service rep." (AR 33) (citing (AR 122)); *see also* (AR 33) (citing (AR 132-36) (medical consultant, Myung Song, D.O., affirming Dr. Dickey's opinions at reconsideration level)).

In this setting, the Court's duty is not to resolve the conflicting opinions and ultimately decide whether Petitioner is once-and-for-all disabled as that term is used within the Social Security regulations. Rather, this Court must decide whether the ALJ's decision that Petitioner is not disabled is supported by the record. On this record, there is a lack of corroboration in the medical record, alongside conflicting medical opinions which gave rise to the ALJ's decisions on how to consider the opinions of Dr. Manos. The ALJ's decision to discount and give little weight to those opinions is supported by clear and convincing, specific, and legitimate reasons for doing so. Hence, because the evidence can reasonably support the ALJ's conclusions in these respects, this Court will not substitute its judgment for that of the ALJ's, even if this Court were to have a different view. *See Richardson*, 402 U.S. at 401; *Matney*, 981 F.2d at 1019.

## 2. Petitioner's Credibility

As the trier-of-fact, the ALJ is in the best position to make credibility determinations and, for this reason, his determinations are entitled to great weight. *See Anderson v. Sullivan*, 914 F.2d 1121, 1124 (9th Cir. 1990); *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities). In evaluating a claimant's credibility, the ALJ may engage in ordinary techniques of credibility evaluation, including consideration of claimant's reputation for truthfulness and inconsistencies in claimant's testimony, or between claimant's testimony and conduct, as well as claimant's daily activities, claimant's work record, and testimony from

**MEMORANDUM DECISION AND ORDER - 12**

physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains. *See Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). Also, the ALJ may consider location, duration, and frequency of symptoms; factors that precipitate and aggravate those symptoms; amount and side effects of medications; and treatment measures taken by claimant to alleviate those symptoms. *See* SSR 96-7p, *available at* 1996 WL 374186 (discussed *supra*). In short, "[c]redibility decisions are the province of the ALJ." *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989). However, to reject a claimant's testimony, the ALJ must make specific findings stating clear and convincing reasons for doing so. *See Holohan*, 246 F.3d at 1208 (citing *Reddick*, 157 F.3d at 722).

Petitioner alleges that the pain she experienced as a result of her impairments impacted her ability to use stairs, bend down, sit or stand for long periods of time, while also affecting her ability to bathe, shave, and use the toilet. *See* (AR 235) ("Function Report - Adult" identifying physical abilities before impairment: "Go up stairs easily, be down on my knees to clean out cabinets and such, cannot sit for long periods of time or stand without being in a lot of pain [(now)], I could also see better. . . . I am in pain when standing in the shower, feet, legs, and back. It is difficult for me to put pressure on one leg while I shave the other – it causes pain in knees, leg, and feet. Painful sitting down [(on the toilet)] and getting up, especially knees, but back also."). Her pain also prevented her from preparing more than simple meals, carrying a laundry basket, or doing more than dusting and wiping counters off. *See* (AR 236). She would go shopping some weeks, but other times would have her daughter pick things up for her. *See* (AR 237). She had to do chores at a reduced pace to avoid aggravating her pain; had difficulty sitting down long enough to take care of her bills, read, or watch movies; and was no longer able to go for walks as she had in the past. *See* (AR 236-38).

**MEMORANDUM DECISION AND ORDER - 13**

Petitioner reiterated these difficulties at the December 10, 2014 hearing, testifying in response to questions posed by the ALJ and her attorney:

ALJ: Now, now when you filed your application for Disability Benefits, you complained of quite a lot of problems. You said you had back problems, dizziness, knee problems, nerve damage, degenerative disk, disk and lower back keeps breaking up, severe knee pain in both legs. Leg aches. Left leg aches due to nerve damage. Dizziness, sometimes room spins. Blurred vision, pain, dizziness in both feet. Pain stiffness in both feet.

A: Yeah.

Q: I didn't think dizziness in both feet was wright. Pain and stiffness in both feet. Numbness in left foot, plantar fasciitis. Feel tired all the time. Chronic fatigue. In a lot of pain most of the day. Are you still alleging all those?

A: Pretty much, yes.

Q: Are you alleging any new symptoms?

A: Just the last time I tried to go for a walk I had a lot of hip pain, which was new to me. And when I went to one of the doctors they said that that was probably caused from either my knees or my back and they called it a transfer lesion, you know. And I told them, I said well, I've never had problems with my hips, you know, in the past.

Q: Uh-huh.

A: So I just thought it was weird because the pain was so bad I didn't even want to walk for very long.

. . . .

Q: Do you know what caused – did you have the doctors examine you to determine what was causing the hip pain?

A: Well, like I said, the one orthopedic doctor, his assistant said that it was a transfer lesion and it could be caused because my knees, the way I understood it, and I'm not a medical professional, but they said I had trochlear dysplasia of the knees. And he said that the grooves in my knees aren't deep enough so it causes them to go out so they're not aligned properly. And on top of that I have cartilage thinning and especially, I guess, in the one leg it's really bad. And you can hear like when I goo up and down

steps or get up, you can hear my knees grind.  But anyway, he just said that because of the back and the knee pain that that's what was causing the hip pain because everything's out of align.

. . . .

ATT:   Okay.  So in September 2012, you lifted a sofa?

A:     Yeah.

Q:     After that, was the pain that started then as severe as it is now, or has it gotten progressively worse since you lifted the sofa?

A:     I would say it's gotten worse, but the thing is before theat I wasn't on the Gabapentin, and the Gabapentin helps with the pain because I was getting to a point where I couldn't even bend over.

Q:     Okay.  So what types of things could you do when you first had the pain after lifting the sofa?

A:     Not too much of anything because I was pretty limited.  I mean I was, like I said, getting worse to the point where if I even tried to bend over, if I tried to lift anything, it just was causing me way too much pain.

Q:     Okay.  What did you do to help with the pain?

A:     I immediately started taking some old Gabapentin that I had.

Q:     So Gabapentin, that was at that time would have been six years old?

A:     Yeah.

Q:     Okay.  Not necessarily the smartest thing to do.

A:      No, but I was told by a pharmacist that it's safe to take even if it's older.  It's not going to hurt you.

. . . .

Q:     So, so give me an example of the type of job you were applying for after you stopped being a caregiver?

A:     Like bank and credit union jobs, cashier.  I don't remember exactly everything.  Store jobs.

**MEMORANDUM DECISION AND ORDER - 15**

Q:      Okay.  So if you would have been hired as a cashier or a bank teller or something like that, could you have done that job eight hours a day?

A:      No. I don't think not eight hours a day, not with the standing that's required and because it bothers me a lot to stand –

Q:      Okay.

A:      Like for any, you know, length of time.

Q:      So what if we got you a job back then where you were able to sit most of the time?

A:      That's another, like I can't sit for very long either without it bothering me. And like even right now I might be sitting but I'm in pain so –

Q:      Right.  So back then in September of 2012, when you were out applying for jobs, you say you couldn't have stood for the job, you couldn't have sat for the job?

A:      Not like for long periods.  I could probably do, you know, short periods where I was changing off and on or something, but I don't know, you know, exactly what types of jobs.

Q:      So like with what we call a – it's called a sit/stand option where you have the option to stand when you need to, sit when you need to?

A:      Yeah.

Q:      So you think you could have done one of those jobs eight hours a day, five days a week?

A:      Probably not eight hours a day, five days a week, no.

. . . .

Q:      Okay.  What were you doing during the days back then?  What was your day like?

A:      What do you mean by back then?

Q:      Back in 2012 when you stopped working as a caregiver.

**MEMORANDUM DECISION AND ORDER - 16**

A:     Well, basically my activity level dropped and I went around the house doing what I could do, but like there are some things that I'm limited or was limited in.  And with my daughter living with me, she was able to help me with a lot of –

Q:     All right.  Well –

A:      – you know –

Q:     – let's get a little specific.  What types of things could you do around the house?

A:     Wipe off counters, maybe clean a litter box if I wasn't sitting for very long, that type of thing.  If I vacuum too long it bothers my back.  Just I try to stay away from, you know, lifting anything heavy.  Like if I have a heavy basket of clothes I ask my daughter for help because it's really easy for me to get back spasms and that type of thing.

Q:     Okay.  So did you do any of the cooking?

A:     Limited, like if something was fast.  But like I just noticed like I would try to do a bigger meal and I'd get in my kitchen and I could not stand for as long as I used to be able to.  Like if I did like, for example, I like to cook cabbage rolls, but that's a long process and for anyone that has cooked them.  And it's just a lot of work and there's a lot of standing, and I can't, I can't do a batch anymore.  I have to have help from my daughter.

Q:     Okay.  And that was, you were at that limited level back then when you claim you became disabled?

A:     Yes.

Q:     Okay.  How long could you vacuum before you had to stop?

A:     In 2000, starting in 2012?

Q:     In 2012.

A:     Oh, maybe a few minutes.

Q:     Okay. And then you just couldn't tolerate that anymore?

A:     It starts to bother my back, yeah.  So –

Q:     Okay.  Did you do any gardening?

A:     maybe some yard work but, you know, not like – again, my daughter would pretty much help me with a lot of that, and it was very limited.  Like I really, I would try to like pull weeds and stuff, but the bending over repeatedly just I can't do.

Q:     Okay.  All right.  So what were the typical things you would do in a typical morning back in 2012?

A:     Just get up and I will add that when I do get up I clearly think that I have arthritis because I'm very sore and very stiff and for my age I don't think it's normal for me to be as stiff and sore as I am, and that usually takes a couple hours for me to shake and I don't, it doesn't really completely go away.  But anyway, I get up.  I get dressed.  Usually get something to eat.  I'm not really a breakfast person.

Q:     Okay.  Did you have any difficulty using the shower or bathtub?

A:     It does bother me to take a shower.  Like if I'm in the shower for a long time because the surface is hard and so it bothers my legs and my back to stand in there for any –

Q:     But you're able to do it without assistance?

A:     Yes.

Q:     Okay.  Then you get breakfast.  Do you prepare your breakfast, or did you prepare your breakfast back then?

A:     Sometimes and sometimes not.  Sometimes my daughter would make it.

Q:     Okay.  What would you do after breakfast?

A:     Just things around the house, what I can do, like I don't know, dust, you know, wipe down counters.  Like I said, if I could clean like maybe one litter box.

Q:     Okay.  So would you do –

A:     Laundry, but –

Q:     Would you do that from 9:00 until 12:00?  Did that occupy your whole morning?

**MEMORANDUM DECISION AND ORDER - 18**

A:     Yeah, pretty much.  I mean, you know, slowly, probably slower than your average person, but –

Q:     Okay.  So the pace was decreased compared to say what your daughter does in terms of –

A:     Oh, yeah.  She can run circles around me.

Q:     Okay.  So what do you do after – what did you do after lunch?

A:     Pretty much the same thing.  I don't live an exciting life.  Just, just trying to do stuff around the house and then eventually, you know, some days, not every day, I do get tired, and I think a lot of it has to with being on Gabapentin.  So sometimes I do lay down.  And then there are some days when I have dizzy spells, but it's not every day either.  And on those days, if I try to lay down sometimes it doesn't really help because the room starts spinning and I don't even know what all that is about with the room spinning.

                                    . . . .

Q:     Okay.  So back in 2012, how long were you having to lie down during the day?

A:     Probably for maybe a half-an-hour to an hour.

Q:     Okay.  And then after your little break you could get up and return to doing chores but at a slower rate than normal?

A:     Yes.

Q:     Okay.  How much TV did you watch back then?

A:     We watched, I don't know, not a lot of TV, I would say, but some TV.  But like if I go to sit down to try to watch a movie it usually bothers me if I sit down for, you know, like more than an hour.  Then I'm just –

Q:     Okay.

A:     – uncomfortable . . . and especially with my knee problems, too . . . like if I have to get up.

Q:     – you able to get out and go to, say, the grocery store or attend social events or church activities?

A:      Yes, but a lot of times I'll send my daughter because like if she's going to be shopping for a while or doing whatever she does, I don't like to be out that long because it does bother my back and my knees and my feet.

Q:      So how long back in 2012 could you go out shopping?

A:      Maybe an hour.

Q:      Okay. And then you'd have to come back. What other things could you do outside of the house back then?

A:      I would try to go for walks because I do like going for walks and I have a dog that, you know, needs to be walked. So that was probably the main thing.

Q:      So how far in number of blocks could you take your dog for a walk?

A:      Oh, I don't know. Maybe like a quarter of a mile.

Q:      Okay. So your testimony is, is things have gotten progressively worse.

A:      Yes.

Q:      So, let's just say in February of this year when you had your MRI that things were a lot worse than they were back in 2012. Is that the way you remember it?

A:      Well, I wouldn't necessarily say that because I knew as soon as I had to start taking the Gabapentin because I would say that the pain was just as bad then. It's just that being on the Gabapentin, and thank God I'm one of those people that can be on it and it actually helps me, I would say that the pain was probably just as bad then because I could tell if I bent over, you know, something was really wrong. It's not normal to have that much pain when you're bending over.

Q:      Okay. So what's the difference in pain between 2012 and 2014?

A:      It's probably about the same or worse.

Q:      Okay. So you haven't seen any big difference since you hurt yourself with the sofa?

A:      No.

Q:     All right.  Now your medical records, as you've indicated, are a little bit sketchy.  You were self-medicating with the Gabapentin you had back from 2006, and then it looks like you went in to see your family doctor about eight months after you hurt yourself, actually ten months after you hurt yourself.

A:     Uh-huh.

Q:     Why was there such a big delay?

A:     For one thing, I don't have insurance so the cost of an appointment was, you know, with me losing my job or not having employment I had to put it off.  Temporarily I used the old Gabapentin, but I did get the doctor that I used to go to, to write me a new prescription because she knew of my problems from the past from the 2006 surgery.

Q:     Okay.  So your doctor that you saw in 2006 was willing to give you a prescription for Gabapentin because you didn't have insurance?

A:     Yes.  I guess, I –

Q:     Okay.

A:     – guess you could say that, yes.

Q:     So the old Gabapentin and the prescription from the doctor you didn't actually visit with kept you going for ten months until you got into St. Alphonsus in August of 2013.  Is that right?

A:     Yes.

Q:     Now you went and saw the Social Security consultant in September of 2013.  In his report he indicated that you had good days and bad days.  I guess when you saw him you were having a pretty good day because he didn't see that many limitations.  Is that the way you remember it?

A:     I don't, what do you mean by seeing him because I didn't see anybody that I can remember?

Q:     You didn't see Dr. James Bates?

A:     Oh, you mean the doctor?  Okay.

Q:     From Social Security.

A:     Okay.

Q:     He wrote a report.  He did an examination on you.  He basically –

A:     Oh, yeah.

Q:     – couldn't find anything wrong with you, but he did write in his report that you said you had good days and bad days.

A:     Yes.

Q:     Were you having a really good day when you saw him?

A:     I wouldn't say a really good day.  I mean I'm not claiming that I, you know, can't walk or can't do this or can't do that.  I'm just claiming that I have pain when I do a lot of things that normal people do that don't have pain when they do them.

Q:     Okay.

A:     So I probably maybe was.  I don't actually remember, to be honest with you, because that was a while ago.

                    . . . .

Q:     Okay.  Dr. Manos says he thinks you can lift about 20 pounds.  Is that about right?

A:     Yeah.  I could probably lift 20 pounds but not repeatedly like, you know, if I had to do it at a job on a regular basis.  Like I can lift, like we have jugs of litter.  We used to buy the big buckets.  I don't buy those anymore because they're like 35 pounds and they're, you know, just too heavy to lift.

Q:     Right.  And you've been limited to 20 pounds since you first hurt yourself with lifting the sofa?

A:     I would say so, yes.

Q:     Okay.  Dr. Manos also thought that you'd need some breaks during the day if you did get a job and that the breaks that you needed might be longer than what's normally given.  Do you think that's a correct statement?

A:     Yes.

**MEMORANDUM DECISION AND ORDER - 22**

| Q: | And in a typical month how many days do you think you would be out sick due to your back pain? |
|---|---|
| A: | It's hard to say.  I mean I wouldn't purposely, you know, try to miss work, but I don't know.  Probably at least a couple. |
| Q: | Okay.  At least two days? |
| A: | Yeah. |
| Q: | Is there any job, especially the jobs that you've done in the past, that you think you could currently do eight hours a day, five days a week? |
| A: | Not eight hours a day, no, five days a week. |

(AR 57-58, 61-64, 67-77).

Still, the ALJ found that Petitioner's "statements concerning the intensity, persistence and limiting effects of [her alleged] symptoms are not entirely credible," reasoning that (1) her treatment records are limited; (2) despite having "insurance issues," she cares for at least 10 stray cats; (3) her activities of daily living and medical records are contrary to the level of decreased function alleged; and (4) she has an "inconsistent work record."  *See* (AR 30-31). Though it may be possible to appropriately challenge Petitioner's credibility, the specific reasons offered by the ALJ for doing so here are lacking under closer scrutiny.

First, even if there is a paucity of treatment records discussing the severity of Petitioner's alleged impairments, that fact must be measured in context and in this case the medical record itself is particularly limited in this respect.  In other words, this is not a case where, within a voluminous medical record, only a scattering of instances of Petitioner's claimed limitations exist.  Simply put, there are few treatment notes on this topic to begin with, presenting a challenge not only to confirm Petitioner's claimed conditions (as the ALJ implies), but also to reject it.

**MEMORANDUM DECISION AND ORDER - 23**

Second, at the hearing, Petitioner testified that she runs a "cat rescue." (AR 86). The ALJ implies that Petitioner's limitations are not as severe as she claims because she is able to care for cats; however, this fact also must be considered in context and the record indicates that Petitioner has not "adopted" any new cats since 2012 (presumably around the time of her alleged onset date) and would prefer to have fewer. *See id*. at (AR 86-87) (Q: "Yeah. Okay. So you don't do, as you sit here at the hearing today you're not involved in cat rescues? You're just keeping the ten cats that you had since 2012?" A: "Yes." Q: "So they're your pets and you're not getting rid of them?" A: "Well, I would like to give . . . some of them away to good homes. But, like I said, it's hard to find a good home."). Moreover, the ALJ leaves undiscussed the fact that the cats also belong to the Petitioner's daughter, who, actually, does most of the work caring for the animals. *See* (AR 86) (Petitioner testifying: "Just, like I said, a litter box. We have cats ans so, you know, I try to do, help my daughter with the litter boxes. She does most of them, but I don't think it's fair that, you know."); *see also infra*.

Third, the ALJ points to the above-cited "Function Report - Adult," noting that, as to her daily activities, Petitioner has "indicated that she goes shopping once or twice a week for clothing, food, and other household items." (AR 33). But Petitioner also described her need for frequent assistance from her daughter in accomplishing these tasks – mentioned in the *same* "Function Report - Adult" that the ALJ relies upon in his credibility determination. *See, e.g.*, (AR 235-37); *see also* (AR 67-71, 86, 88, 89, 96) (Petitioner testifying to daughter's care).

Fourth, the medical records that the ALJ suggests are inconsistent with Petitioner's claims are, upon closer scrutiny, "more smoke than fire." For example:

- The ALJ submits that, while Petitioner "indicated that her condition led to falls in September 2013, her medical records show she denied falls from

August 2012-2013." (AR 33) (citing AR 234, 279).[3] But this is not inconsistent – she said she did not fall in the time period from August 2012 to August 2013, but did experience falls in September 2013.

• The ALJ's reliance on records pertaining to an examination of Petitioner's *upper* extremities (*see id.*) is disconnected from and arguably immaterial to Petitioner's allegations regarding her lumbar spine and knee impairments. *See Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015) ("[A]n ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination. To ensure that our review of the ALJ's credibility determination is meaningful, and that the claimant's testimony is not rejected arbitrarily, we require the ALJ to specify which testimony she finds not credible, and then provide clear and convincing reasons, supported by evidence in the record, to support that credibility determination.").

• Even though a September 2013 MRI indicated "no significant osteoarthritis," an MRI roughly a year later revealed cartilage softening/thinning, full-thickness fissuring of the patellar ridge, and dislocation of the patella in both knees. *Compare* (AR 283), *with* (AR 320-21). The ALJ relied on the earlier MRI test (*see* AR 33), when the objective, closer-in-time, MRI was a contradiction to this piece of his credibility determination.

• In discounting Petitioner's claims of chronic back pain, the ALJ states that she "reported that she was in no pain as recently as November 2014." (AR 33) (citing (AR 299)). However, that treatment note was actually from February 7, 2014, at which time Petitioner was being seen for issues surrounding her blood pressure and a cough. *See* (AR 297). Moreover, despite the notation that Petitioner was not reporting any pain in relation to her office visit, she nonetheless mentioned her back pain and was referred out for a lumbar MRI at this time. *See* (AR 297, 300).

• The ALJ states that Petitioner's "inconsistent work record [(in addition to the above-discussed credibility factors)] indicate that non-impairment related factors have led to her current unemployment status." (AR 33). But the ALJ fails to connect the dots here, as there is nothing in the record to suggest that

---

[3] The Court recognizes that it is unclear whether the ALJ meant that Petitioner stated that she did not suffer a fall from August 2012 through the end of 2013 or from August 2012 through August 2013. A review of the medical record cited in the ALJ's Decision indicates that the latter interpretation is correct. *See* (AR 279) (8/19/13 treatment note, with following reference: "Patient has not fallen in the last year.").

> Petitioner's unemployment was voluntary. To the contrary, after 2009 when she lost her job as a caregiver, Petitioner testified that she sought employment with banks, credit unions, and stores. *See* (AR 53, 62-63).

Thus, these reasons do not offer clear and convincing explanations as to why the ALJ did not find Petitioner's testimony entirely credible.[4] This is not to say that this Court conclusively finds Petitioner to be disabled under the applicable rules and regulations, or that Petitioner suffers from chronic pain. Instead, this Court only concludes that the ALJ's decision to doubt Petitioner's credibility in denying disability benefits does not contain clear and convincing reasons for doing so. Remand is therefore appropriate in this discrete respect.

3.     Newly-Submitted Evidence to the Appeals Council

"Social security claimants usually have one opportunity to prove their disability. If this were not the case, the administrative proceedings would become an unending merry-go-round." *Coulbourn v. Astrue*, 2008 WL 2413169, *8 (E.D. Cal. 2008) (internal quotation marks omitted). However, SSA regulations "permit claimants to submit new and material evidence to the Appeals Council and require the Council to consider that evidence in determining whether to review the ALJ's decision, so long as the evidence relates to the period on or before the ALJ's decision." *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012); *see also* 20 C.F.R. §§ 404.970(b), 404.976(b)(1). New evidence is material if it bears "directly and substantially on the matter in dispute." *Luna v. Astrue*, 623 F.3d 1032, 1034 (9th Cir. 1984). Review of the case is warranted only if the Appeals Council finds "that the administrative law

---

[4] Respondent's briefing on the issue of Petitioner's credibility simply echos the ALJ's rationale – that is, it neither buttresses the ALJ's findings with additional argument and support, nor responds to the criticisms presented by Petitioner in her briefing. *See* Respt's Brief, pp. 10-11 (Docket No. 20). Under the circumstances presented here, this is not enough.

judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record."  20 C.F.R. § 404.970(b).

Where, as here, the Appeals Council considered additional evidence but denied review, the additional evidence becomes part of the record for purposes of this Court's analysis.  *See Brewes*, 682 F.3d at 1163 ("[W]hen the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence."); *accord Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1232 (9th Cir. 2011) (courts may consider evidence presented for first time to Appeals Council "to determine whether, in light of the record as a whole, the ALJ's decision was supported by substantial evidence and was free of legal error").   Remand is necessary where material evidence gives rise to a "reasonable possibility" that the new evidence might change the outcome of the administrative hearing.  *See Borrelli v. Comm'r of Soc. Sec.*, 570 Fed. Appx. 651, 652 (9th Cir. 2014) (citing *Booz v. Sec'y of Health & Human Servs.*, 734 F.2d 1378, 1380-81 (9th Cir. 1984)).[5]

Here, Petitioner claims that the newly-submitted evidence shows that Kurt J. Nilsson, M.D. examined Petitioner, reviewed the x-rays and MRIs of her knees, and recommended

---

[5]  Claimants need not show good cause before submitting new evidence to the Appeals Council.  *See Brewes*, 682 F.3d at 1162; *see also Brent v. Astrue*, 2010 WL 3521788, *5 (C.D. Cal. 2010) ("While Section 404.970(b) dictates the proper procedure for the Appeals Council to follow in deciding whether to review a case in light of the submission of new evidence, Section 405(g) – which, unlike the aforementioned regulation, requires a showing of 'good cause' for the belated submission of new evidence – governs 'judicial review' of new evidence *submitted for the first time to the district court*.  This Court will not superimpose the 'good cause' requirement of Section 405(g) onto the Appeals Council's review of new evidence pursuant to Section 404.970(b).") (emphasis in original, internal citations omitted)).

**MEMORANDUM DECISION AND ORDER - 27**

physical therapy and eventual knee replacement surgery. *See* Pet.'s Brief, p. 19 (Docket No. 15) (citing (AR 337-38)). From this, Petitioner argues that "Dr. Nilsson's diagnoses and recommendation demonstrates that Petitioner's knee impairment, on its own, was more significant than acknowledged by Dr. Bates, the non-examining sources, or the ALJ" and, as a result, the matter should be remanded for further proceedings. *Id*. at p. 19-20. Petitioner's arguments, however, miss the point.

First, there is no dispute that Petitioner has problems with her back and knees, and that such problems are severe. Indeed, the ALJ concluded as much when making his disability determination. *See supra* (citing (AR 28-29) (stating "aforementioned impairments" (including degenerative disc disease of the spine and arthralgia of the knees) "are considered severe because they have more than a minimal limiting effect on the claimant's ability to perform basic work activity."). Therefore, to the extent the newly-submitted evidence from Dr. Nilsson can be read to "demonstrate" the existence of Petitioner's impairments, it necessarily would not have altered the ALJ's Decision – it *supports*, not detracts from, the ALJ's conclusions on this issue.

Second, Dr. Nilsson's treatment notes speaks to the second step of the sequential process in that it helps identify a "medically determinable impairment or combination of impairments." *See supra*. Importantly, such information *does not* inform the fourth step of the sequential process – Petitioner's residual functional capacity to do physical work despite her degenerative disc disease and knee arthraligia. *See id* at (AR 30-34); *see also* (AR 338) ("45 minutes were spent with the patient today, more than 50% of which was spent describing diagnosis and treatment options and coordinating care."). It is on this latter, discrete point that the ALJ questioned Petitioner's credibility, not whether, in fact, Petitioner had certain severe

impairments to begin with.  (AR 16-19).  Simply put, Dr. Nilsson's records also do not speak to the ALJ's credibility analysis and, as such, do not operate as a separate basis for remand.

## IV.  CONCLUSION

The ALJ is the fact-finder and is solely responsible for weighing and drawing inferences from facts and determining credibility.  *See Allen*, 749 F.2d at 579; *Vincent ex. rel. Vincent*, 739 F.2d at 1394; *Sample*, 694 F.2d at 642.  If the evidence is susceptible to more than one rational interpretation, one of which is the ALJ's, the court may not substitute its own interpretation for that of the ALJ.  *Key*, 754 F.2d at 1549.

However, here, the reasons given by the ALJ for questioning Petitioner's credibility are not properly supported; the case is therefore remanded for this reason.  The ALJ shall revisit Petitioner's credibility for the purposes of any disability determination.

## V.  ORDER

Based on the foregoing, Petitioner's request for review is GRANTED and this matter is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum Decision and Order.  *See Melkonyan v. Sullivan*, 501 U.S. 89, 99-100 (1991).

DATED:  **December 21, 2017**

Honorable Ronald E. Bush
Chief U. S. Magistrate Judge